WILLIAM W. CORCORAN & another *vs.* DAVID HENSHAW.
SAME *vs.* JOHN HENSHAW & another, Executors.

H., C. and others agreed by indenture with the contractors for building a canal to take certain amounts of bonds of the canal company at the rate of $60 for every $100, payable in instalments; and trustees were appointed to superintend the completion of the canal, receive the bonds, and issue them to the subscribers, from time to time, on being paid the stipulated price. More than two years afterwards H. gave C. an order on the trustees, which they accepted, to deliver to C., on his paying them therefor sixty cents on the dollar, such bonds to a certain amount, " which I am entitled to receive under my subscription; " and with this order gave C. a bill charging him with this amount of bonds at eighty five and a half per cent., deducting the sixty per cent. to be paid on the delivery of the bonds, and adding an agreement that H., " if the above bonds' are not delivered by said trustees " within six weeks, should " account to C. for the interest upon " the balance " after said time until said bonds are delivered." *Held*, that this was a sale to C. of H.'s right to take, on payment of sixty per cent., bonds to the amount specified, without any warranty of title to the bonds; that the agreement to pay " interest " was valid, and obliged H. to pay a continuing annuity of six per cent. on such balance, determinable upon the delivery of the bonds to C., either by the trustees, or by H. or his representatives; that a tender of the bonds to C., by the executors of H., three years later, with or without the consent of the trustees, put an end to this obligation; and that C., if he absolutely refused to accept the bonds so tendered, on the ground that the contract of all the parties was broken, and that he was not then bound to accept or pay for them for any purpose, could not object to the validity or title of the bonds so tendered.

TWO ACTIONS OF CONTRACT upon the agreements of David Henshaw, contained in this paper :

" $23,000.                              Boston, January 24, 1850.

Please deliver to Messrs. Corcoran and Riggs or order Bonds of the Chesapeake and Ohio Canal Company to the amount of twenty three thousand dollars, which I am now entitled to receive under my subscription of $100,000, on their paying you therefor sixty cents on the dollar.

" Very respectfully your obedient servant,

" David Henshaw.

" Messrs. Nathan Hale and others, trustees, &c."

" Boston, January 23, 1850.      Accepted for the trustees,

" Nathan Hale."

" Messrs. Corcoran and Riggs      To David Henshaw, Dr.

" To an order on Nathan Hale and others, trustees, for $23,000 Chesapeake and Ohio Canal bonds, 85½ . . . . . . . . . . . . . . . . $19,665 00

Corcoran & another *v.* Henshaw & his Executors.

" Deduct, to be paid by Messrs. C. & R. to said
trustees when said bonds are delivered, 60 per
cent. . . . . . . . . . . . . . . . . . . 13,800 00

" Difference payable as cash to D. H. . . . . . $5,865 00
    " It is understood that if the above bonds are not delivered
by said trustees, first week in March, that I am to account to
Messrs. Corcoran & Riggs for the interest upon said premium,
viz : ($5,865,00) after said time, until said bonds are delivered.
    " Boston, January 24, 1850.          David Henshaw."

    The first action was brought on the 30th of October 1854,
during the lifetime of David Henshaw, to recover interest, from
the 6th of March 1850 to the date of the writ, upon the sum of
$5,865 paid by the plaintiffs according to the contract. The
second action was brought on the 15th of August 1854, against
David Henshaw's executors, for the interest subsequently accrued,
and also for not delivering bonds to the plaintiffs according to
the contract. Both actions were tried together before *Thomas*, J.,
who reserved them for the determination of the whole court,
with power to draw such inferences from the evidence as a jury
might draw. All the facts material to the understanding of the
questions of law decided are stated in the opinion.

    *C. P. Curtis & C. P. Curtis, Jr.* for the plaintiffs.

    *W. Whiting & W. G. Russell,* for the defendants.

    SHAW, C. J.* These two actions are founded on the same
contract and cause of action ; the first commenced against Hen-
shaw in his lifetime, and now defended by his executors ; the
second brought against the executors after Henshaw's decease.
Both rest on the same grounds.

    The paper relied on as the contract between the parties,
respecting the transfer and assignment of certain bonds of the
Chesapeake and Ohio Canal Company, is not a direct agree-
ment, expressing the contract of sale and assignment of these
bonds, and the terms and conditions on which it is to be made ·
but consists of two brief memoranda, on the same paper, dated

THOMAS, J. was not present when this case was argued.

January 23d 1850, and signed by Henshaw, the one in the form of a bill, in which the plaintiffs, Corcoran & Riggs, are charged and made debtors to Henshaw, " to an order on Nathan Hale and others, trustees, for $23,000 Chesapeake and Ohio Canal bonds," at eighty five and a half cents on the dollar, subject to a deduction of sixty per cent. to be paid by Corcoran & Riggs to the trustees, when the bonds should be delivered. This was accompanied by an order drawn by Henshaw on Nathan Hale and others, trustees, directing them to deliver to the plaintiffs bonds of the Chesapeake and Ohio Canal Company, to the amount of $23,000, "which I am now entitled to receive under my subscription of $100,000, on their paying you [the trustees] therefor sixty cents on the dollar." This was accepted by Hale, for the trustees, the acceptance being dated on the day previous to that of the order. Probably the acceptance was procured by Henshaw before it was delivered to Corcoran & Riggs.

These memoranda are so brief, have so many references to external facts and persons unexplained, that it is difficult to learn from them what was the legal effect of this contract, without reference to the other transactions and the relations of the parties.

What was the nature of these bonds? what were the trusts and powers of the trustees? what was Henshaw's title under his subscription of $100,000? the effect of his order on the trustees, and of their acceptance? To ascertain these relations, we must resort to the indenture referred to, an elaborate contract, to which the plaintiffs and the defendant Henshaw were both parties in the same right.

The indenture was dated the 29th of September 1847, between James Hunter, Thomas G. Harris and William B. Thompson of the first part, David Henshaw, Corcoran & Riggs and a large number of others of the second part, and John Davis, Horatio Allen and Nathan Hale of the third part.

This indenture recites a former contract and agreement, dated the 15th of April 1845, between the Chesapeake and Ohio Canal Company, and Walter Gwynne, William B. Thompson, James Hunter and Walter Cunningham, a copy of which is annexed to

23 *

this indenture, by which said four persons (two of whom are the same with two of the persons being the first party to this indenture) had contracted, on certain conditions, to build and complete said canal from lam No. 6 to Cumberland, receiving from said canal company bonds, some of which have been guarantied by other parties; that they had made various subcontracts for the execution of portions of the work, which were still in force, but remained unexecuted; that, in consequence of various unforeseen obstacles, the stipulations entered into by the said parties by the said articles, for completing the said canal, had remained unexecuted; but that said Hunter, Harris and Thompson, having succeeded in their endeavors to obtain the necessary aid of other parties to enable them to complete said canal, and confiding in the readiness of the canal company to accept the contract of said Hunter, Harris and Thompson to complete said canal, had engaged to receive exclusively, in place of other engagements, the bonds of said canal company, which bonds are to be issued by said company in conformity with the act of the State of Maryland for the completion of the said canal, which bonds are to be made prior liens on the resources and tolls of the canal; that as the present value of the bonds of the canal company must depend on the assurance parties have of the early completion of the canal, the parties of the first part have found it necessary to enter into a contract with responsible persons, who have engaged to take said bonds, as the same shall be issued, at a price agreed, for the purpose of obtaining the necessary funds, to an amount deemed sufficient, viz: $500,000 in money, in addition to certain guaranties, and they have accordingly entered into an engagement with David Henshaw and others, parties of the second part, to sell them of said bonds, as they shall be issued, in payment of said work, the amount set against their respective names, they paying therefor, on delivery, at the rate of $60 in money for every $100 in bonds, the same to be delivered from time to time, as they shall be issued, in proportions to be specified, within certain periods, the amount of bonds to be $833,333, and the amount to be paid in money $500,000; that for more effectually carrying

these agreements into effect, the parties have thought it expe‑
dient to appoint trustees who shall act as agents and attorneys
for the parties of the first part, and the parties have agreed to
entrust the same to John Davis, Horatio Allen and Nathan
Hale, parties of the third part, who undertake the charge of
carrying into effect the execution of said contract for completing
the canal, assuming the direction and superintendence of the
work, receiving the bonds to be issued by the canal company,
delivering to each of the subscribers such an amount, from time
to time, of the said bonds, as they will be entitled respectively
to receive and bound to purchase, disposing of the residue in the
manner to accomplish most effectually the objects of the inden‑
ture and the intent of the parties, and applying the proceeds to
the payment for work and in discharge of engagements under
the said contract.

The indenture then proceeds by proper stipulations to carry
these purposes into effect. The parties of the first part make
the necessary assignments and confer the necessary powers, the
parties concur in the appointment of Davis, Allen and Hale, as
attorneys irrevocable and trustees; and whenever, on com‑
pletion of any portion of said work, or the performance of any
of the conditions of the former contract with the canal company,
the parties of the first part (contractors) shall be entitled to any
payment in bonds, by virtue of said contract, then the agents
and trustees are authorized to receive the same and give good
acquittances therefor, and on so receiving them, to apply and
appropriate them. The parties of the second part agree to take
and pay for bonds, each for the amount set against his name, at
the rate of $60 each for $100 in bonds, with limitations of the
time within which instalments are to be paid in, and the amount
of each instalment, with a stipulation for certain payments to
be made at banks named. The parties of the third part accept
the trust, and covenant, each for himself and not for the others,
to carry the same into effect, by carrying into effect, as far as
shall be in their power, the former contract with the canal com‑
pany, by enforcing the contracts of subcontractors, making
new contracts, by receiving the bonds which shall from time to

time become payable by the canal company, and exchanging such of them for the sums of money stipulated to be paid for them, by the parties of the second part (the subscribers), disposing of further portions, &c.; the trustees agree to keep regular accounts.

To this indenture, duly executed, David Henshaw and Corcoran & Riggs were subscribers, as parties of the second part, the former to the amount of $100,000, and the latter to the amount of $241,600; and the whole amount required was subscribed by about thirty parties.

By this indenture we ascertain what was the nature of the bonds of the Chesapeake and Ohio Canal Company, which were the subject of the contract of sale and assignment by Henshaw to Corcoran & Riggs; what the one intended to transfer and the other to acquire; how and in what qualified manner Henshaw was entitled to them under his subscription for $100,000; what was the power and authority of the trustees to receive the bonds of the canal company, and to deliver them to the subscribers from time to time, in limited amounts, on receiving from such subscribers $60 on $100, to be used and applied by themselves to the completion of the canal and other uses, as expressed in the indenture. We also learn that the facts, and the relations of all these parties named in the indenture, were determined by a formal instrument, to which Henshaw and Corcoran & Riggs were largely interested parties, and of course that they were as well known to one of these parties as to the other.

It may be important, also, to consider the dates of the two transactions, as connected with the things contemplated to be done, and things which probably were done in the meantime. The indenture was made in September 1847, and the assignment to Corcoran & Riggs in January 1850, that is, after a lapse of about two years and four months. The leading object of the arrangement was to effect the immediate completion of the canal, by the new contractors, but under the direction and superintendence of the trustees, and in strict subordination to their powers, as agents and trustees, conformably to the former

contract. This was undoubtedly considered as a valuable and profitable contract with the canal company, in favor of the contractors, because it is manifestly contemplated by the parties to the indenture, that they could afford to complete the canal on the original terms, though, in order to accomplish it, they must raise half a million of dollars, at the enormous sacrifice of paying $100 for every $60 advanced.

After the lapse of more than two years, the premium stipulated to be paid by Corcoran & Riggs was a fraction over $25 on each $100 of the expected bonds, which we may presume to be the market price at the time; and from this circumstance we may presume that much work had been done on the canal, and that its prospects were good. When the canal should be completed, then bondholders were to have a prior lien on its revenues, except only what might be required for necessary current expenses. If we may judge from experience, these bonds had, during these two years and more, been in the various stock markets of the country, with varying prices, but on the whole rising. We are also to consider that, though sold in 1850 at the great advance of $25 for $60 to be advanced, there was still room for further advance; and if the enterprise should prove successful, each bondholder would receive nearly $15 more for each $60 advance in addition to the interest, which left an opening for a large profit to the purchaser at the then market rate. Of this probably no capitalist was better able to judge than Corcoran & Riggs.

With these views we will now consider the contract of assignment and conveyance of the bonds, which is the basis of these actions. We assume that these securities, though called bonds, were, by force of the statute under which they were authorized, by a blank indorsement, or in some other mode, negotiable, and transferable by delivery. No question is made on this point, and the whole argument on both sides has proceeded on the ground that a good legal title to these bonds would pass by an assignment and delivery, as in case of a note payable to bearer, or to a payee named, or order, and by him indorsed **in** blank.

We will first consider the assignment, that being the instrument of transfer between the parties, and the order on the trustees being only an instrument and means of giving effect to and executing the assignment.

The assignment assumes the form of a bill of sale of a chattel. " Messrs. Corcoran & Riggs to David Henshaw Dr. To an order on Nathan Hale and others, trustees, for $23,000 Chesapeake and Ohio Canal bonds, at 85½," and carried out at the entire sum which they would cost the purchasers. This was not the sum which they were to pay Henshaw the seller. They were in' no event to pay him anything more than the premium. Hale and others were not his agents to receive $60 on each $100 of bonds for him, but for themselves to hold and use and apply, according to the trusts of the indenture.

Then what did the purchasers acquire by the nature of this bargain and the terms of this bill of sale or assignment? Not chattels, not securities in the nature of chattels, such as notes to bearer or certificates of stock, but a right of preemption, a right to purchase of a third party, pursuant to a preexisting agreement, certain bonds for $60 in the $100, bonds which would secure the payment of $100 to the purchaser for each sum of $60 to be paid for them, on delivery. It being a right to purchase of the trustees, on payment to them of $60 in the $100, their acceptance was an acknowledgment of notice of such transfer to the extent of $23,000 of bonds, and of their assent to it, so that afterwards, in reference to that amount of bonds, they stood in the same relation to Corcoran & Riggs in which they previously stood to Henshaw. The right was fully acquired by the purchasers by the delivery by Henshaw of this order on the trustees, and their acceptance of it, without any further act to be done by the latter. Had the enterprise been successful, and had the bonds proved available according to their tenor, the purchasers would have been reimbursed their advance, with a profit of $15 on $85 advanced, viz: $25 premium for the right to purchase the bonds of Henshaw, and $60 for the purchase money, to the trustees.

Literally, the bill of sale was of " an order" on the trus-

tees. But under the circumstances, this order transferred all Henshaw's right. What that right was, and what the pur-chasers understood it to be, were determined by the various provisions and terms of the indenture, and nothing was needed to transfer the right from one subscriber to another, but an order on the trustees and an acceptance by them. The order itself, to some extent, explains what the parties intended, by a direct reference to the subscription of Henshaw of $100,000. It was not a sale of bonds *in præsenti*, deliverable *in futuro ;* it was not an executory contract for a sale and delivery of bonds at another time ; it was the sale of a present qualified right to purchase the bonds from those who, by the contract, were ap-pointed to sell them. This right passed by the assignment and order.

In these papers there is no express stipulation or warranty of title or quality of anything. But it is said in the argument, that if a man sells property, describing it as of a particular character or quality, he does, by implication of law, warrant it to be of that character or quality. This principle, however sound, will not aid the plaintiffs. Nothing is described in this assignment but the vendor's right, to be obtained by means of an order, which was exactly described, conformably to the fact, as ascertained and explained by the indenture.

Another maxim is relied on, that in every sale of personal property the law implies a warranty on the part of the vendor that he is the owner of the property and can give a good title. But this well known rule of law is equally unavailing to charge Henshaw. In these memoranda, and in this transaction, Hen-shaw never was, and never professed to be, the owner of the bonds ; on the contrary, he could not be the owner of the bonds until he had paid the stipulated sixty per cent. for which they were to be given, and taken them into his own possession, by delivery from the trustees. The very contract itself implies hat this never had been done, and the purpose of the contract was, to enable the assignees to do what the assignor was to do, in order to make them his own and have property in them.

It is further argued that the words in the order, after the words

" bonds," &c. viz : " which I am now entitled to receive under my subscription of $100,000," amount to a warranty that he was then entitled to receive the bonds from the trustees. But we think this is not the true construction. If the trustees were then ready to deliver the bonds, why resort to the instrumentality of an order and acceptance, which looked to some future time for their delivery ? Again ; the vendor does not speak of his right as an absolute and unqualified right to receive, but as his title to receive " under his subscription," or according to his subscription, which both parties understood to be a limited and qualified right, and both knew what those limitations and qualifications were.

Nor is there any ground to contend that there was any misrepresentation, on the part of Henshaw, of the nature and character of the bonds in question, or of his title to them, or of the cases in which, or the times when, and purposes for which the trustees were to receive them, or of the nature of the obligation of the trustees to deliver them. All the facts bearing on these points were fully known to the plaintiffs.

Whether, by their acceptance, the trustees incurred any obligation to these plaintiffs, to deliver the bonds absolutely, is a question on which it is not necessary to give any opinion in the present case. But it may be proper to remark, that if the order on them was to deliver to these plaintiffs $23,000 of the first bonds which should come into their hands, applicable to the subscription of Henshaw, according to the stipulations and trusts in the indenture, and not otherwise, their acceptance would be construed with the limitations expressed in the order. It is testified, and not controverted, that no bonds did afterwards come to the hands of the trustees, applicable to the subscription of Henshaw, except the sum of $5,000, which was actually delivered to the plaintiffs, and thus satisfied their contract *pro tanto.* Then, if the above is the true construction of the acceptance of the trustees, as construed in reference to a contract to which these plaintiffs, Henshaw and the trustees were all parties, then it would seem that the trustees contracted no obligation by their acceptance, which they have not performed. But this is a question to be decided when it arises.

Here was a species of marketable commodity, in the nature of stock, well known to both these parties. It had already greatly risen in value in the market, beyond the cost price; but there was room for it to rise still further, and afford a profit to the purchaser. But it was attended with some hazard; and this hazard, in the opinion of the court, the purchaser intended and was content to take. He proposed to purchase Henshaw's right of preëmption, with the means of asserting it; and this he obtained. The trustees and acceptors of the order were an independent party; they were not the agents of Henshaw; nor was he bound by law, that they should perform what they had undertaken. He entered into no obligation to the plaintiffs, express or implied, to deliver the bonds or guaranty their delivery; and the failure of the trustees to deliver the bonds, whether justifiable or not, as between these plaintiffs and themselves, was not a breach of any obligation of Henshaw, for which this action will lie on the contract.

Nor has the consideration failed, were this a suit to recover back the purchase money. It may be likened to a case, where a number of persons have associated to establish a bank, and the subscription for capital is full, and a charter is obtained. The prospect is so favorable, that the scrip or right to take shares is at a premium. A. B., for a consideration, transfers his right to C. D., and receives his authority to take his shares to his own use. Afterwards, difficulties arise in organizing the bank, or such changes in financial affairs, that it ceases to hold out a prospect of profit, the project is abandoned, and the stock never paid in. It appears to us, that there was no failure of consideration, the purchaser had the right which he stipulated for, with a full knowledge of all the facts, and took his chance whether it would be profitable or not. So of a patent right, or other incorporeal right, actual or inchoate. Where the purchaser agrees to pay for a chance, and there is no misrepresentation and no warranty on the part of the vendor, the purchaser whilst he will enjoy the gain if it prove profitable, must stand the hazard if it prove a failure. Other analogous cases could be readily suggested.

We do not adopt the argument pressed by the counsel for the defendants, that the plaintiffs did not make reasonable demand upon Hale;. or did not tender the sixty per cent. in money; or did not cause protest to be made of the nondelivery of the bonds; or that they did not give due notice to Henshaw of the non-delivery of the bonds by the trustees; but simply place our judgment on the ground,.that the subject matter of the bargain was Henshaw's right of preëmption of property never his own, and the full performance of that agreement, by the execution and delivery, to the vendees, of the assignment of his right, and the. simultaneous delivery of his order on the trustees, accepted by them, which together vested in them all the right, title and interest, which was the subject of the contract.

2. There is another claim made on the part of the plaintiffs, on a separate and distinct stipulation of Henshaw, for interest. This claim is made in both actions, the one brought against Henshaw in his lifetime, which was solely for interest, and that brought against his executors after his decease. This was a stipulation by Henshaw, appended to the bill of sale or assignment, by which he engaged with the plaintiffs, that if the above bonds were not delivered by said trustees the first week in March, he was to account to them for the interest on said premium after that time, till the bonds were delivered.

This we consider as a good and valid contract, made on good consideration, and to be performed according to its terms. Strictly speaking, it is not interest. Interest is money to be paid for the use of capital, on a loan of money, or the forbearance of a debt, and becomes part of and incident to a debt; or it is damages for the detention of a debt due, and fixed by law at a given rate, in proportion to the amount of money lent, or detained, and the time for which it is thus lent or detained. In either case, it is incident to a debt, to be paid with it and as a part of it. Here was no loan, or forbearance of money due, no debt detained, and therefore we say it was not, strictly speaking, interest. It was like interest in these respects; it was to be calculated upon a certain sum, and depend on time. It was, as stated by one, of the learned counsel in argument, an annuity

not however, as stated, a perpetual annuity, but a continuing annuity, determinable upon the delivery of the bonds. But upon the happening of that event it must cease by the terms of the express contract by which it was created. Such is the effect of Henshaw's contract. *Suffolk Bank* v. *Worcester Bank,* 5 Pick, 106.

The question then is, whether the running of this interest or annuity can be put an end to, by a delivery or tender of the bonds, by any party other than the trustees. It is probable that the parties had in view a delivery of the bonds by the trustees, an event then expected by both parties to occur, but without any imit of time within which it should be done. Still it was an act, the performance of which, by Henshaw or his personal representatives, would be as beneficial to the plaintiffs as if done by the trustees, viz : the obtaining of the bonds, cɔ paying therefor, on delivery, sixty cents on the dollar of the nominal amount. The act to be done, on which Henshaw's obligation to pay the stipulated interest or annuity was to cease and determine, could be as effectually and beneficially done by him or his representatives, as by the trustees. And it is to be considered that, in the written memorandum constituting the obligation to pay such interest, it is to continue, not until the trustees shall deliver the bonds, but " until said bonds are delivered," without saying by whom. Under these circumstances, the court are of opinion, that Henshaw and his representatives had such an interest in the performance of this condition, duty or act, that they might themselves perform it, in order to determine the daily accruing interest, or annuity, which was to cease on its performance.

It is objected on the part of the plaintiffs that a right of action having accrued for the nondelivery of the bonds pursuant to the contract, such right of action could not be defeated by a subsequent tender of the articles; and that when a cause of action has accrued for the nondelivery of articles, the right to receive the value in money by way of damages becomes vested.

If this argument goes upon the ground that Henshaw had broken his obligation by the nondelivery of the bonds, it cannot

avail, as we have already decided that he was under no contract that the bonds should be delivered.

If the argument assumes that the trustees had broken their obligation by the nondelivery of the bonds, and had become answerable for the value in money as damages, and that the interest now claimed is due, in the nature of damages, as interest on account of detaining such sum, the first answer is, that it has not yet been decided, that there has been such a breach on the part of the trustees, or that such cause of action against them has accrued to the plaintiffs.

But a more decisive answer is, that the defendant did not make his undertaking to pay interest, so as to continue till the trustees had fully performed their contract; but until the bonds should be delivered, which was a condition which he himself might perform. Nor was the tender made by the executors, after the decease of their testator, made for the purpose of defeating any right of action against the trustees, if any, which had accrued to the plaintiffs; but for the purpose of doing a duty, or complying with a condition, which, by the terms of their testator's undertaking, would terminate his liability, and that of his estate, to a continuing payment of the interest or annuity, on his special agreement to that effect. In this view, it appears to us to be immaterial whether the tender was made with the consent and concurrence of the trustees or not. The evidence is, that they neither assented nor objected, but declined giving any authority to the executors to act for them.

3. Several objections are taken to the tender of bonds, made by the executors of Mr. Henshaw to Messrs. Corcoran & Riggs, in February 1853, as proved by the deposition of Chilton:

That it was not made till after the commencement of the first action. We do not consider it a bar to either action, but only as fixing a time down to which the second action will lie.

That it was not made in behalf of the trustees, nor by their authority. For reasons already stated, we think it was rightly made in their own behalf as executors.

That it was not made in money. This again presupposes that Henshaw and his estate had become liable in damages, as for a breach of contract, which was not the case.

That it proceeds on the ground that the contract was still in force. The plaintiffs' contract to pay a continuing interest annuity was still in force, not broken prior to the tender, but determinable upon such tender.

4. Several other objections, as to the genuineness and sufficiency of the bonds, the property of the defendants in them and the like, we think, are all answered by the fact that Corcoran, to whom they were offered, declined to accept them on any terms, on the ground that the contract of all the parties was broken, and that he was not bound to accept and pay for them, at that time or for any purpose.

Finally, the court are of opinion that the plaintiffs are entitled, in the first action, to recover interest on the amount — deducting that due in respect to $5,000 in bonds, which were in fact delivered by the trustees in March 1850 — from the time fixed for its commencement, in the memorandum, to the commencement of the first action; and in the second, the same rate of interest from the time of the commencement of the first to the time of the tender, with costs.